IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JEFFREY GILL                                                                                            PLAINTIFF

v.                                              CIVIL NO. 21-2129

KILOLO KIJAKAZI,[1] Acting Commissioner                                       DEFENDANT
Social Security Administration

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATIONS

Plaintiff, Jeffrey Gill, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claims for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See U.S.C. § 405(g).

### I.     Procedural Background:

Plaintiff protectively filed his application for DIB on December 20, 2017, alleging an inability to work since September 20, 2015, due to osteoarthritis, degenerative disc disease, lumbar pain, arthritis, gout pain, high blood pressure, and right shoulder pain. (Tr. 302, 353). The ALJ issued a fully favorable decision on October 22, 2019, finding Plaintiff disabled between September 20, 2015, and June 30, 2016, his date last insured. (Tr. 129–137).  On May 7, 2020, the Appeals Counsel vacated the hearing decision remanded the case to the ALJ for further proceedings, finding the ALJ erred in relying upon medical records from 2019 to find Plaintiff

---

[1] Kilolo Kijakazi has been appointed to serve as the Acting Commissioner of Social Security, and is substituted as Defendant, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

1

disabled. (Tr. 138–144). The Appeals Council directed the ALJ to: obtain updated treatment notes relevant to the period on or before June 30, 2016, to complete the record; if necessary, obtain opinion evidence from a medical expert regarding Plaintiff's impairments during the relevant time period; give further consideration to Plaintiff's RFC and provide appropriate rationale with specific references to the evidence of record, giving further consideration to the medical opinions and prior administrative medical findings and Plaintiff's symptoms; further evaluate Plaintiff's past relevant work; and if warranted by the expanded record, obtain supplemental evidence from vocational expert to assist in determining Plaintiff's ability to perform past relevant work or adjust to new work. A second administrative hearing was held via telephone on December 3, 2020, at which Plaintiff appeared with counsel and testified. (Tr. 87–110).

On January 21, 2021, the ALJ issued an unfavorable decision. (Tr. 12–32). The ALJ found that Plaintiff last met the insured requirements of the Act on June 30, 2016. (Tr. 18). The ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe: degenerative disc disease of the lumbar spine with facet arthrosis, thoracic spine spondylosis, and obesity. (Tr. 18). However, after reviewing all evidence presented, the ALJ determined that through the date last insured, Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 18–19). The ALJ found Plaintiff retained the residual functional capacity (RFC) to perform the full range of medium work as defined in 20 C.F.R. §§ 404.1567(c). (Tr. 19–23).

With the help of a VE, the ALJ determined that Plaintiff could perform his past relevant work as a painter and alternatively could perform the requirements of other medium exertion

occupations such as kitchen helper, hand packager, or packing machine operator. (Tr. 23–24). The ALJ found Plaintiff had not been under a disability, as defined by the Act, from September 20, 2015, through June 30, 2016, the date last insured. (Tr. 24).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which was denied on June 7, 2021. (Tr. 1–3). Subsequently, Plaintiff filed this action. (ECF No. 2). The parties have filed appeal briefs and this case is before the undersigned for report and recommendation pursuant to 28 USC §636 (b). (ECF Nos. 12, 15). The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs and are repeated here only to the extent necessary.

## II.     Evidence Presented:

On April 28, 2011, Plaintiff had a new patient appointment with W.E. Buddy Williams, DO, with complaints of gout and arthritis in his ankles and knees. (Tr. 529). Plaintiff was assessed with gout and elevated blood pressure and was prescribed Probenecid, asked to monitor his blood pressure, and return to care in 3-4 weeks.

On January 9, 2013, Plaintiff was seen by Dr. Williams for pain in the lower abdomen that had been ongoing for a couple of months and medication refills. (Tr. 526–28). Plaintiff's abdomen was noted to be soft with no hernia. His diagnoses were cervical disc displacement without myelopathy, pain in limb, and abdominal pain-possibly thoracic radiculopathy. He was asked to undergo a CT scan to take place on January 11, 2013. On the same date, Plaintiff had X-Rays of his thoracic and lumbar spine which revealed lumbar curvature, multi-level disc degeneration, facet arthrosis at L4-L5, and spondylosis of the thoracic spine. (Tr. 525).

On January 11, 2013, Plaintiff underwent a CT scan which showed sigmoid and descending colon diverticulosis without diverticulitis.

On January 2, 2014, Plaintiff was seen by Jeffrey Snider, DC, and reported that his left cervical, upper thoracic, lumbar, and sacral back were generally around 6/10 on a pain scale and noticeable 40% of the time. (Tr. 689). Plaintiff was five feet, and nine inches tall and weighed 210 pounds. Dr. Snider noted subluxations with associated hypertonic muscles and edema in cervical, thoracic, and lumbar spine as well as the pelvis. Plaintiff was treated with moist heat, electrical stimulation, and spinal adjustments.

On June 22, 2016, Plaintiff saw his chiropractor, Dr. Snider, for left sacroiliac, pelvic, buttock, posterior knee and leg, sacral and headache discomfort which he rated at 2/10 with pain that was noticeable approximately 30% of the time. (Tr. 690–91). The onset of pain was gradual and was first noticed one week prior and the pain was worsening. It was aggravated by bending, climbing, lifting, and twisted and was relieved by lying down, medications, and resting. The pain was 9/10 at worst and 1/10 at best. A physical examination revealed multiple level subluxations with hypertonic muscles and edema at the affected levels, decreased range of motion in the lower back, spasm, and myofascitis. Dr. Snider assessed Plaintiff with lumbago with sciatica on the left side, cervicobrachial syndrome, pain in the thoracic spine, and other muscle spasm. Plaintiff was treated with cryotherapy, electrical stimulation, and spinal adjustments. Plaintiff was advised to ice his lower back for 15 minutes on, 45 minutes off every reasonable waking hour and to stay out of the recliner.

On June 27, 2016, Plaintiff saw Dr. Snider and reported being 90% improved and well pleased with the progress achieved so far. (Tr. 692–93). He rated his pain at 3/10 at the moment and reported feeling better since the last visit with his pain being noticeable 60% of the time. Plaintiff weighed 230 pounds, and his blood pressure was 156/96mmHg. He was observed to have spinal subluxations with associated hypertonic muscles and edema at the effected level. His

lower back range of motion was decreased in all ranges with marked decreases noted in flexion and extension of the lumbar spine. He was also assessed with myofascitis. Plaintiff was given spinal adjustments and myofascial release. He was advised to increase his water intake for the next 24 hours. Moist heat and electrical stimulation were also used.

On October 6, 2016, Plaintiff saw Lavon Wood, MD, for a checkup on back pain. (Tr. 501–503). Plaintiff had a lengthy history of back pain after working as a painter for 40 years he had pain in his ankles, feet, hips, and neck as well but had never been on daily medication for the issues. He was unable to work as a painter anymore. He had a history of gout but was not acutely having an attack. Plaintiff was asked to follow-up in two weeks, log his blood pressure daily, and consider physical therapy. Plaintiff was scheduled for blood work and prescribed allopurinol.

On October 20, 2016, Plaintiff was seen by Dr. Wood and brought his blood pressure log which showed systolic rates of 150-170 and diastolic rates of 80-100. (Tr. 506–07). Plaintiff reported he had been eating much healthier and decreased his alcohol intake significantly and that he was feeling much better overall. Plaintiff reported having a toenail removed and stopping exercise for two weeks but having been cleared to restart. He had been out of meds for over one week for his high blood pressure.

On November 18, 2016, Plaintiff was seen by Adam Bingham, DPM, with pain in his right toe with a history of hitting it on a bed frame several weeks ago followed by pain and swelling. (Tr. 494–95). Physical examination revealed normal muscle strength and adequate range of motion in the ankle but painful incurvated right hallux medial and lateral nail border with significant adjacent soft tissue hypertrophy, malodor, serosanguinous drainage, and erythema. Plaintiff was assessed with ingrown toenail, pain in right toe, cellulitis of right toe. Plaintiff had in office toenail and hypertrophic skin removal, was prescribed Keflex and advised

about shoe modifications, activity modifications, and offloading measures as well as care of the site.

On January 9, 2017, Plaintiff was seen by Dr. Wood for hypertension and bronchitis. (Tr. 509–511). Plaintiff reported he had not been feeling well, he had improved after one week but was now worsening. He had not taken any over the counter medications but had not been exercising either. A physical examination revealed coarse breath sounds, normal gait, and grossly normal muscle tone and strength. Plaintiff's blood pressure was 172/107 mmHg. Plaintiff's diagnoses were primary hypertension and acute bronchitis, and he was given a refill of metoprolol, prescribed lisinopril, and a course of azithromycin.

On June 11, 2018, Plaintiff saw Dr. Snider for left cervical dorsal, left posterior shoulder, arm, elbow forearm and wrist discomfort which he rated 5/10 with pain noticeable approximately 80% of the time. (Tr. 694–95). Plaintiff was assessed with lumbago with sciatica on the left side, cervicobrachial syndrome, pain in the thoracic spine, and other muscle spasm.

On January 22, 2019, Plaintiff was seen by Jonathan R. Broniste, NP, for a wellness physical and new patient visit. (Tr. 549–51). Plaintiff reported having been on metoprolol over a year ago for hypertension, arthritis in his lower legs, gout in his feet, toes and knees at times. He was having ongoing pain in his feet when standing that included tingling and felt like standing on rocks. He had pain and stiffness in his legs and had been having these issues for seven or eight years. Plaintiff's diagnoses were gout, obesity, pain in both feet, and essential hypertension. He was prescribed metoprolol and indomethacin and was scheduled for blood work.

On April 16, 2019, Plaintiff was seen by Nurse Broniste and reported having had to stop working at Aflac, which he had started in December of 2018, due to increased anxiety. (Tr. 545–48). He was not sleeping well, having racing thoughts, and had difficulty being in crowds. He

felt rested in the morning on most days. Plaintiff's BMI was above normal, and he was counseled about diet and exercise. He was diagnosed with primary insomnia, obesity, and generalized anxiety disorder. He was prescribed sertraline and hydroxyzine.

On June 3, 2019, Plaintiff was seen by Nurse Broniste, and reported he had started working selling Aflac insurance in December of 2018 but had now had to stop working due to increased anxiety, he had tried meds but was unable to tolerate them. (Tr. 542–44). Plaintiff wanted to try something different and was still having trouble sleeping. He also reported pain in his right leg which was worse when in a sitting position and had no falls but felt weak in the right leg at times.

On June 12, 2019, Plaintiff saw Thomas E. Cheyne, MD, for chronic low back, bilateral hip, and bilateral leg pain and numbness. (Tr. 533–34). Plaintiff had mild to moderate tenderness in the lower back, decreased sensation in the lower legs to light touch, mildly positive straight leg raise bilaterally, but full range of motion in his joints, good strength and muscle tone, and a normal gait. Dr. Cheyne opined that the X-rays of Plaintiff's lumbar spine indicated severe degenerative disc disease from L2 to L4 and at L5-S1. Plaintiff was diagnosed with chronic bilateral sciatica with underlying diffuse degenerative disc disease. He was to take his ibuprofen or indomethacin daily, take hot showers daily, stay at light activity, go to physical therapy and return in one month for follow-up.

On June 19, 2019, Plaintiff had an initial evaluation for physical therapy with Letitia McMaster, PT. (Tr. 560–665). The goal of this course of treatment was to decrease his pain to 5/10 and progress to strengthening exercises after a month, with the long-term goal of reducing pain to 2/10 and be able to ride in the car. He was independent in his activities of daily living and mobility skills. Plaintiff reported his pain at this visit at 9/10 in his low back and bilateral lower

extremities. Plaintiff was noted to have good rehab potential and was to attend physical therapy twice a week for twelve weeks.

On July 1, 2019, Plaintiff had physical therapy for bilateral sciatica and reported his back pain was 3/10 and 4 or 5/10 for the right leg and knee. However, walking fifty yards or less and sitting caused increased pain in his low back up to 8 or 9/10. (Tr. 566–68).

On July 9, 2019, Plaintiff had physical therapy and reported the pain in his low back was off and on, but the right leg and knee pain was constant. (Tr. 570). His left leg had recently been swollen, stiff, and sore and started popping.

On July 11, 2019, Plaintiff had physical therapy and reported he was getting better; that the piriformis stretch was helping; and that he often felt a pop in the lumbar area with this movement that immediately decreased the pain. (Tr. 572–74).

On July 16, 2019, Plaintiff had physical therapy and reported 1/10 pain upon arrival but reported having fallen on Saturday after being unable to pick up his right foot then stubbing his left toe on a piece of equipment which caused him to trip and cut his head on a brick wall. (Tr. 576).

On July 25, 2019, Plaintiff had physical therapy and rated his pain as 2.5/10 but reported a lot of pain in right knee. (Tr. 579). Physical therapy was added with good tolerance. On the same day, Plaintiff saw Thomas Cheyne, MD, for follow-up on his chronic bilateral sciatica with underlying diffuse severe degenerative disc disease. (Tr. 582). Plaintiff had tried physical therapy, heat therapy, and anti-inflammatories with minimal relief so Dr. Cheyne recommended a lumbar spine MRI.

On August 1, 2019, Plaintiff underwent an MRI of his lumbar spine. (Tr. 585). The MRI showed broad based disc bulge with associated spondylitic ridging asymmetrically prominent on

the left side leading to neural foraminal stenosis on the left at the L2-L3 level. Additional mid broad-based disc bulge with minimal spondylitic ridging present at the L3-L4 level.

On August 5, 2019, Plaintiff was seen by Dr. Williams for a follow-up visit. (Tr. 601–08). Plaintiff's diagnoses were primary hypertension, and a BMI of 37-37.9. Dr. Williams encouraged Plaintiff to exercise five times per week for at least 40-60 minutes and limit caloric intake.

On August 7, 2019, Plaintiff saw Dr. Cheyne who had reviewed his recent lumbar MRI and opined that it indicated severe left foraminal stenosis at L2-3 and fairly severe right foraminal stenosis at L3-4. (Tr. 583). Dr. Cheyne did not recommend consultations with a surgeon, but instead pain management and lumbar epidural steroid injections (LESI).

On September 4, 2019, Plaintiff saw Brian Goodman, MD upon referral for lower back pain to administer a LESI. (Tr. 632–33).

On November 21, 2019, Plaintiff was seen by Dr. Cheyne for follow-up of chronic bilateral sciatica with severe left foraminal stenosis at L2-3 and fairly severe right foraminal stenosis at L3-4. (Tr. 655). Plaintiff had undergone two injections, and he felt the first had worked well but he had overdone activity afterwards. His second injection on October 4, 2019, had helped but not as much. Plaintiff was no longer working. He was to undergo two more LESIs and then return to care.

On March 9, 2020, Plaintiff saw Brian Goodman, MD, for a LESI and reported feeling overall healthy and ready to proceed. (Tr. 620–21).

On June 15, 2020, Plaintiff saw Brian Goodman, MD, for back pain to receive a lumbar epidural steroid injection. (Tr. 618–19).

On June 23, 2020, Plaintiff was seen by Venkata Dalai, MD, to establish care via telehealth. (Tr. 640–46). Plaintiff reported feeling depressed, worthless, and guilt over the past 4-5 years since he stopped working due to back pain. He had struggled financially, but this had started to get better after his wife started working. He reported a chronic history of alcohol use, with his last drink being two days ago with 4-5 glasses of red wine. He had been prescribed Zoloft in the past for mood symptoms, but it made him irritable, and he was hesitant to try any medications due to concerns about the side effects of medications. He reported a history of two panic attacks and trying CBD oil which helped at first but did not any longer. He had chronic pain in his back and legs with balance issues. Dr. Dalai opined that Plaintiff's mood symptoms could be related to alcohol abuse and chronic pain or the disability due to pain. Plaintiff was willing to try Lexapro for his mood and anxiety symptoms but was worried he could not stop drinking by himself. Dr. Dalai provided information about Alcoholics Anonymous and regular counseling, particularly motivational interviewing, along with medication options such as naltrexone. Plaintiff preferred to defer Alcoholics Anonymous meetings. Dr. Dalai discussed sleep hygiene and recommended melatonin as a sleep aid, encouraged Plaintiff to eat a balanced diet and participate in outdoor activities including exercise, and return in four weeks.

On July 1, 2020, Plaintiff saw Dr. Cheyne for follow-up on his bilateral sciatica with severe left foraminal stenosis at L2-3 and moderate to severe stenosis at L3-4 on the right. (Tr. 654). Plaintiff had undergone two more LESIs since his last visit in November of 2019 and was getting some good improvement. Plaintiff was to continue LESIs every three months and return to Dr. Cheyne for follow-up in one year or sooner if he had any problems in the meantime.

On July 14, 2020, Plaintiff saw LPC Jason Hays who noted he had been referred by Dr. Dalai for alcohol use and major depressive disorder. (Tr. 596–98). Plaintiff reportedly realized he

was unable to work anymore in September of 2015 due to a back injury, and that focused on his mental health. He reported two major panic attacks, one in 2016 sitting at home and another when he was driving. Dr. Dalai tried him on Lexapro for three days, but it made him weak and dizzy with excessive sweating. He had been prescribed Effexor, but he was afraid to start it because of the side effects he had with Lexapro. Previously, Plaintiff had thought he could sell Aflac, but he had a panic attack in his trainer's office. Plaintiff was diagnosed with a panic disorder and major depressive disorder, recurrent episode, moderate.

On July 22, 2020, Plaintiff was seen by Nurse Broniste for gout, anxiety, and low back and hip pain. (Tr. 664–70). He had tried Lexapro in the past but could not tolerate it and had been switched to Effexor but had not started it yet and felt he needed something to help him calm down. Plaintiff was assessed with benign hypertension, anxiety, and palpitation. He was to have blood work done and was prescribed hydroxyzine HCL for anxiety.

On August 4, 2020, Plaintiff saw Jason Hays, LPC, for psychotherapy and was diagnosed with panic disorder and major depressive disorder, recurrent episode, moderate. (Tr. 595). Plaintiff was to undergo treatment for the next six months, with the goals of developing more self-awareness and coping skills.

On September 4, 2020, Plaintiff was seen by Dr. Goodman for another LESI. (Tr. 739–42).

On September 29, 2020, Jason Dax Hays, LPC, wrote a letter stating that the functional assessment form required an MD/PhD co-signature, but there were no doctors at Stonehaven, only therapists. (Tr. 707). LPC Hays proposed that perhaps Plaintiff's primary care physician could review the form and add his signature. LPC Hays completed a checkmark Mental Residual Functional Capacity Assessment form and indicated that Plaintiff had no useful ability to

function on a sustained basis in the following area from September 20, 2015 through the date of his opinion to: maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, or be punctual within customary tolerances; sustain an ordinary routine without supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; function independently; behave in an emotionally stable manner; relate predictably in social interactions; demonstrate reliability; work without deterioration or decompensation causing the individual to withdraw from the situation or causing exacerbation of symptoms or adaptive behaviors. (Tr. 709).

On November 2, 2020, LPC Hays wrote a letter declining to release Plaintiff's entire chart but offering a few excerpts from the chart. (Tr. 731–32). On September 23, 2020, Plaintiff reported feeling very panicked (though not a full panic attack) three or four days prior. He had used his notes form the previous session to calm down and thinking about trying to find jobs as a consultant in the past, but that companies don't want him because he could not go up and down a ladder. On September 16, 2020, they had discussed his difficulty with driving even just to the therapist's office made him nervous. He was also thinking a lot about finances and felt like he needed to get something going, but he could not paint, could hardly drive, could not sit down for more than ten minutes, and could not stand for more than fifteen minutes. On August 18, 2020, Plaintiff had discussed the negative effects of his physical disability and talked about late September of 2015 when he had been painting two big homes and when he pulled into his own

driveway at the end of the day, he could not move, observing that was when he started really noticing something was wrong with his back, but he was also very worried about his finances.

### III. Applicable Law:

This court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that his or her disability, not simply his or her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience. *See* 20 C.F.R. § 404.1520(a)(4). The fact finder only considers Plaintiff's age, education, and work experience in light of his or her residual functional capacity if the final stage of the analysis is reached. 20 C.F.R. § 404.1520(a)(4)(v).

## IV.    Discussion

Plaintiff raises the following issues in this matter: 1) whether the ALJ erred in failing to procure further medical opinion evidence, thus failing to fully and fairly develop the record; 2) whether the ALJ erred in her treatment of the opinion evidence in her RFC findings; and 3) whether the ALJ erred by failing to properly evaluate Plaintiff's subjective complaints and apply the Polaski factors. (ECF No. 12).

Plaintiff contrasts the prior Fully Favorable decision, wherein the ALJ found Plaintiff would be limited to only light work, with this decision wherein the ALJ found Plaintiff could perform medium work. Plaintiff argues the prior decision was based upon the same evidence reviewed in this case, and that the key difference between the two decisions was that the ALJ considered the degenerative nature of Plaintiff's conditions and relied upon the longitudinal evidence in the medical record in reaching an RFC determination in the first decision. (ECF No. 12, p. 3). Plaintiff further argues that this change in restriction from light work to medium work

was not based upon new opinion evidence, as the state agency consultants opined there was insufficient evidence and did not reach a formal RFC assessment. Plaintiff argues that this was not harmless error as the ALJ found Plaintiff could return to his past relevant work as a painter, which was medium work. (ECF No. 12, p. 5). The Commissioner argues the ALJ had an adequately developed record and fully considered the longitudinal medical evidence in reaching the RFC assessment, rendering a consultative examination unnecessary because the ALJ had sufficient evidence to make a decision. (ECF No. 15, p. 3). Additionally, the Commissioner argues a consultative examination would have been of no value, due to the remoteness of Plaintiff's date last insured, and Plaintiff's contention that the ALJ should have obtained medical expert testimony also lacked merit as it was not ordered by the Appeals Council.

The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure her decision is an informed decision based on sufficient facts. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). However, the ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record. *Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014) (quoting *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994). While "[a]n ALJ should recontact a treating or consulting physician if a critical issue is undeveloped," "the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted).

This case is complicated by an application date of December 20, 2017, more than a year after Plaintiff's date last insured, and limited medical records during the nine-month period between Plaintiff's alleged onset date and his date last insured. While a consultative examination

during the relevant time period would have had great evidentiary value, a consultative examination made after the Appeals Council order in 2020 would be unlikely to provide strong evidence regarding Plaintiff's RFC in 2016.

The ALJ did seek opinion evidence and had asked state agency physicians to provide opinions as to Plaintiff's RFC during this time period. In February of 2018, Dr. Robert Redd opined there was insufficient evidence to rate the case at the DLI. (Tr. 116). Upon reconsideration, Dr. Dan Gardner reaffirmed this opinion in May of 2018. However, Dr. Redd only reviewed evidence from November 15, 2016, through February 8, 2018, noting that there was no medical evidence of record prior to the date last insured. (Tr. 114–116). Dr. Gardner only reviewed evidence from October 6, 2016, to May 8, 2018. (Tr. 122–26). Based upon their recounting of the evidence they reviewed and Dr. Redd's notes, they did not review any evidence prior to the date last insured. Given the degenerative nature of Plaintiff's disease and objective findings prior to the date last insured, reviewing the entire medical record may have allowed them to reach an opinion as to Plaintiff's RFC. One piece of evidence they did not review was the X-Ray of Plaintiff's spine in January of 2013, which showed that two years prior to his alleged onset date he was already suffering from curvature of the lumbar spine, multi-level disc space narrowing, spondylosis throughout the lumbar spine, pseudarthrosis at L4 and L5, and spondylosis throughout the dorsal spine. (Tr. 114-115, 122-126). As the ALJ noted in her prior Fully Favorable Decision, the diagnostic imaging provides important evidence regarding the degenerative changes in Plaintiff's spine and the progression of their severity over time. (Tr. 134). The lack of opinion evidence wherein the degenerative nature of Plaintiff's impairments could be considered, renders further development necessary.

While a consultative examination this far removed from the date last insured would likely be of limited value, a medical review of the entire record can still provide valuable opinion evidence regarding Plaintiff's abilities from September 20, 2015, through June 30, 2016. On remand, the ALJ should address interrogatories to a medical expert requesting that said physician review all of Plaintiff's medical records; complete an RFC assessment regarding Plaintiff's capabilities during the time period in question; and provide the objective basis for the assessment so that an informed decision can be made regarding Plaintiff's ability to perform basic work activities on a sustained basis. With this evidence, the ALJ should then re-evaluate Plaintiff's RFC and specifically list in a hypothetical to a vocational expert any limitations that are indicated in the RFC assessments and supported by the evidence.

### III.  Conclusion

Based on the foregoing, it is recommended that the Commissioner's final decision be reversed, and the case remanded back to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 19th day of July 2022

/s/ *Christy Comstock*
HON. CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE